UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

**TINA M. COMPO,**

        **Plaintiff,**

    **-v-**            **7:12-CV-1812**

**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

APPEARANCES:

Lawrence D. Hasseler, Esq.
Conboy, McKay Law Firm
307 State Street
Carthage, New York 13619
Attorney for Plaintiff

Andreea L Lechleitner, Esq.
Sergei Aden, Esq.
Social Security Administration
Office of General Counsel
26 Federal Plaza, Room 3904
New York, New York 10278
Attorneys for Defendant

**Hon. Norman A. Mordue, Senior District Judge:**

## MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

On October 3, 2002, plaintiff filed an application for disability insurance benefits, alleging an onset date of December 6, 1999 due to a back injury. The application was initially denied on April 25, 2003. Thereafter, plaintiff filed an untimely request for a hearing, and although good cause existed to excuse the late filing, plaintiff elected to have a decision made on the record without a hearing. (Tr. 37). On February 25, 2005, ALJ Alan L. Bergstrom issued a decision

denying plaintiff's claim for benefits. (Tr. 12-19). The Appeals Council denied plaintiff's request for review. Plaintiff brought an action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, asking the court to reverse the Commissioner's decision to deny her application for disability benefits. *See Compo v. Comm'r*, 6:05-CV-973 (FJS/RFT).

On October 25, 2005, plaintiff filed a subsequent claim for benefits. After an initial denial and a request for a hearing, ALJ Elizabeth W. Koennecke held a hearing. Addressing this 2005 application, ALJ Elizabeth W. Koennecke determined that in light of the pending District Court action, she would address the case from February 26, 2004 (what she believed to be the day after ALJ Bergstrom's unfavorable decision[1]). (Tr. 494 (stating at the hearing, "we've got a pending District Court appeal. So the earliest I can look at this case is from February 26, 2004 which is the day after the last Administrative Law Judge's decision."). On April 3, 2008 (revised November 21, 2008), ALJ Koennecke issued a fully favorable decision finding that plaintiff was under a disability beginning that date–February 26, 2004.[2]

On July 23, 2009, Senior Judge Frederick J. Scullin adopted the Report-Recommendation and Order of Magistrate Judge Randolph F. Treece and reversed ALJ Bergstrom's February 25, 2005 decision addressing plaintiff's October 3, 2002 application, and remanded the case for further proceedings. *See id.* at Dkt. No. 11. On June 2, 2011, ALJ Koennecke held a video hearing. (Tr. 458-78). In light of the subsequent favorable decision by ALJ Koennecke, this

---

[1] As noted above, Judge Bergstrom's decision was actually dated February 25, 2005.

[2] In this regard, the Court notes that ALJ Koennecke addressed this clerical error in her most recent decision, and determined that she would not reopen the favorable determination to set a later established onset date in the grounds of fairness as the error was not plaintiff's.

remand addressed only the period between September 3, 2000[3] and February 6, 2004. On June 30, 2011, ALJ Koennecke issued a decision denying plaintiff's claim for benefits during this period. (Tr. 286-300). Plaintiff brought an action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, asking the court to reverse the Commissioner's decision to deny her application for disability benefits.

Presently before the court are the parties' cross-motions for judgment on the pleadings. (Dkt. Nos. 15, 19). For the reasons set forth below, the court concludes that the Commissioner's decision should be affirmed.

## DISCUSSION

### A. Legal Standard

The Social Security Act authorizes payment of disability insurance benefits or SSI benefits to individuals with "disabilities." To be considered disabled, a plaintiff must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1832c(a)(3)(A). The Commissioner uses a five-step process to evaluate disability insurance and SSI disability claims:

> [I]f the Commissioner determines (1) that the claimant is not working, (2) that he has a "severe impairment," (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the

---

[3] Plaintiff has amended her alleged onset date to September 3, 2000. (*See, e.g.,* Tr. 371 (February 7, 2011 letter from plaintiff's attorney to ALJ Koennecke stating "She would like to amend her alleged onset date to September, 2000 . . . .").

-3-

> Commissioner must find him disabled if (5) there is not another
> type of work the claimant can do.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000).

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw*, 221 F.3d at 131. Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

**B.    Medical Background**

On December 6, 1999, plaintiff injured her back at work. At an examination on January 24, 2000, Dr. Zeal found left central lumbar disc herniation L4-5 with nerve root and thecal sac impingement, and small central disc protrusion/herniation L5-S1. (Tr. 131-34). Dr. Zeal recommended a lumbar laminectomy and decompression of the nerve root at L4-5. (Tr. 133). Dr. Zeal performed a left L4-5 laminotomy on January 27, 2000. (Tr. 135). At a follow-up visit on February 7, 200, plaintiff was "doing great." (Tr. 148). Similarly, on March 15, 2000, she was doing well, and physical therapy was helping a great deal. (Tr. 147). Dr. Zeal released her to return to work on April 3, 2000. (Tr. 147).

However, in September 2000, after returning to work, plaintiff re-injured her back. (See, e.g., Tr. 205). At a November 20, 2000 examination, Dr. Mark found a recurrent disc herniation, and concluded that at the time, it would not be of any benefit to have her return to work, pending

a further evaluation after a lumbar myelogram. (Tr. 206). In December 2000, plaintiff elected to proceed with operative treatment. (Tr. 196). A February 7, 2001, an examination found strength testing reveals 3+ to 4/5 strength on the dorsiflexors of the left great toe and left foot, otherwise normal strength, mass, and tone in all muscle groups in all four extremities. Gait was antalgic but otherwise normal, and coordination was intact. (Tr. 158). Dr. Mark's plan was to undergo an extensive segmental decompression at the L4-5 level. (Tr. 159). On February 19, 2001, following a lumbar diskectomy, decompression and arthrodesis, she was "doing very well." (Tr. 196).

On March 22, 2001 Dr. Mark found plaintiff "doing relatively well" and she was "encouraged to advance her activities." (Tr. 194). On April 30, 2001, she was doing "reasonably well," was doing her exercises and had been able to advance her activities. (Tr. 194). On June 4, 2001 she was "doing quite well" with numerous unrelated complaints. She had a full range of motion of the lumbosacral spine. Dr. Mark gave her a release allowing her to return to work on June 11, 2001 in a restricted duty status - working up to a maximum of 20 hours a week with no lifting greater than 15 pounds unassisted. (Tr. 192). On July 9, 2001, she did not have any significant problems, her strength was good, and her gait was normal. On the same date, Dr. Mark noted she had reached maximum medical improvement, and returned her to full time work, but restricted to lifting not more than 25 pounds. (Tr. 192).

Plaintiff apparently returned to work, as she lost her job on June 27, 2001 "secondary to some issues between her and her employer." (See, e.g., Tr. 173; Tr. 181 (noting that she was terminated, reportedly for getting worker's compensation benefits at the same time she was working, which she stated did not happen). On September 10, 2001, Dr. Mark noted that she "has

done pretty well" and has returned to work. (Tr. 191). He further observed that she "occasionally has a bad day," for example when she drove in a car for in excess of 9 hours in a single day." (Tr. 191). On November 12, 2001, plaintiff complained of restless legs at night, but no other symptoms. (Tr. 191). Her examination was normal, her gait was essentially normal, her coordination was intact, and her strength was normal. (Tr. 191). On September 26, 2001, Dr. Hobby noted that plaintiff was looking for a job. (Tr. 171). Similarly, on November 21, 2001, plaintiff was still looking for a job, and interviewing with the police force. (Tr. 170). On January 24, 2002, Dr. Mark was comfortable with her returning to full duty with the only restriction being not to engage in any unassisted lifting of greater than 50 pounds. (Tr. 190). He established a new date of maximum medical improvement as January 24, 2002. (Tr. 190). In April and May 2002, plaintiff experienced episodes of back pain and pain into her right gluteal region, which "appear[ed] to be related to strenuous activity." (Tr. 188). In April she was working as a driver for Target, but was terminated on May 8, 2002. (Tr. 188; see also Tr. 212 (noting that plaintiff last worked in March 2002 as a vending company route driver and quit because of back pain).

On July 18, 2002, Dr. Mark noted that a lumbar myelogram demonstrated a disc herniation at the L5-S1 level with protrusion of disc into the right side of the spinal canal impinging upon the right S1 nerve root. (Tr. 183). Dr. Mark planned to see her back in the office in 2-3 weeks, while she contemplated operative and non-operative treatment options, and stated "I don't think she should be working in the interim." (Tr. 183). On the same date, plaintiff received a note "No work - pt is to be scheduled for surgery." (Tr. 184). On August 8, 2002, plaintiff elected to proceed with operative treatment. (Tr. 183). At a mental status examination on January 7, 2003, Dr. Lowe found that plaintiff "performs all usual [activities of daily living]

depending on her physical status of the day." (Tr. 213). At the same examination, her posture was unremarkable, as was gait. On May 8, 2003, Dr. Mark noted that plaintiff experiences back pain and pain radiating into her legs with numbness in her feet if she is in a weight bearing posture for an extended period of time. (Tr. 248). It appears that in June 2003, plaintiff was looking for work, as Dr. Hobby stated "[s]he has not found a job yet." (Tr. 250). In July 2003, she stated she experiences leg and back pain after standing "for a relatively short period of time." However, the physical examination revealed normal strength, mass, and tone, and normal gait. (Tr. 247). In November 2003, while still awaiting authorization for the third surgery, Dr. Mark noted that her condition remains the same. (Tr. 439).

A physical RFC assessment performed by Dr. Willingham on April 22, 2003 found plaintiff to be capable of light work. An RFC assessment performed August 20, 2003 by Dr. Blumenthal also concluded plaintiff to be capable of light work.

Plaintiff eventually had her third surgery January 12, 2005. (Tr. 452-54).

**C.     ALJ's Decision**

First the ALJ found that plaintiff had not engaged in substantial gainful activity from the amended alleged onset date of September 3, 2000 through February 25, 2004. (Tr. 293). Discussing plaintiff's medical history as it relates to her December 1999 back injury, the ALJ next found that during the relevant period, plaintiff had the severe impairment of degenerative disc disease of the lumbar spine. (Tr. 293-94). Specifically discussing Listing 1.04, the ALJ concluded that plaintiff's impairment did not satisfy the criteria of a listing.

Next, the ALJ discussed the evidence and found that between September 3, 2000 and March 1, 2002, plaintiff was capable of lifting/carrying 20 pounds occasionally and 10 pounds

frequently, sitting for 6 hours in an 8 hour workday, stand/walk for 6 hours in an 8 hour workday and occasionally engage in postural activities. From March 2, 2002 through February 25, 2004, the ALJ concluded that plaintiff was capable of lifting/carrying 10 pounds occasionally, sitting for 6 hours in an 8 hour workday, stand/walk for 2 hours in an 8 hour workday and occasionally engaging in postural activities. Therefore, the ALJ concluded that from September 3, 2000 through March 1, 2002, plaintiff could perform light work, and from March 2, 2002 through February 25, 2004, she could perform sedentary work.

The ALJ explained that although plaintiff's medically determinable impairment could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of those symptoms were not credible. The ALJ discussed clinical findings, for example, where Dr. Zeal approved plaintiff to return to work, and Dr. Mark's "largely benign findings on physical examinations" finding that the medical evidence does not support an allegation of total disability during the period in issue. The ALJ further discussed the fact that plaintiff worked during the relevant period, that she prepared meals, did laundry, vacuumed, mopped, washed dishes, grocery shopped, and sometimes helped her husband get dressed. The ALJ also noted that "the Court decision indicates that there was substantial evidence to support Judge Bergstrom's finding that the claimant was not fully credible." (Tr. 297).

With respect to the Court's conclusion that Judge Bergstrom did not appropriately analyze treating physician assessments of record, ALJ Koennecke noted that there are no detailed function by function assessments from a treating source in the record and that plaintiff's attorney acknowledged that there are no detailed assessments from the time period in issue for less than sedentary exertion.

-8-

The ALJ specifically stated that she gave considerable weight to Dr. Mark's limitations on her lifting abilities and her ability to return to full time work. (Tr. 298). With respect to his "no work" comment in anticipation of surgery, the ALJ found that it was "not entitled to significant weight under the Rulings and Regulations as it is not a specific function by function assessment" and is construed as a legal conclusion outside the purview of a doctor's expertise. Additionally, the clinical findings and reported activities of daily living do not support the "no work" comment. The ALJ also stated that she would not "second guess" the opinion of Dr. Zeal, releasing plaintiff to return to work in April 2000. She further explained that his "non-specific caution on lifting, carrying, bending and twisting obviously do not preclude the claimant from all work." (Tr. 298). The ALJ gave considerable weight to the findings of the state agency physicians, Drs. Blumenthal and Willingham, concluding that these opinions were consistent with the medical evidence of record, at least to March 1, 2002. The ALJ gave some limited weight to the plaintiff's complaints of increased symptoms after that date.

The ALJ found that plaintiff was unable to perform her past relevant work, but that, considering the medical-vocational guidelines, a finding of not disabled was directed. (Tr. 299-300).

**D.    Issues In Contention**

Plaintiff argues that: (1) the ALJ erred by failing to properly weigh the medical opinions and appropriately determine plaintiff's RFC; (2) the ALJ erred by failing to properly assess plaintiff's credibility; and (3) the ALJ erred in her Step 5 determination.

**1.    RFC Determination and Evaluation of the Evidence**

A plaintiff's RFC is the most he can do despite his limitations. 20 C.F.R. §§

-9-

404.1545(a)(1), 416.945(a)(1). RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. "A regular and continuing basis means eight hours a day, for five days a week, or an equivalent work schedule." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (citation omitted). In determining RFC, the ALJ can consider a variety of factors, including a treating physician's or examining physician's observations of limitations, the claimant's subjective allegations of pain, physical and mental abilities, as well as the limiting effects of all impairments. 20 C.F.R. § 404.1545(a).

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *see also Kennedy v. Astrue*, 343 F. App'x 719, 721 (2d Cir. 2009) (declining to afford great weight to the treating physician's "check-off form regarding residual functional capacity" explaining that a treating physician's opinion need not be given great weight when it is not consistent with other substantial evidence of record, including the opinions of other medical experts) (citing *Halloran*). When controlling weight is not given, the ALJ should consider the following factors to determine the proper weight assigned to a treating physician's opinion: (1) frequency of the examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; and (4) whether the opinion is from a specialist. See 20 C.F.R. § 404.1527(c); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). The ALJ must properly

analyze the reasons that the report of the treating physician is rejected. *Halloran*, 362 F.3d at 32-33.

As an initial matter, the Court notes that the ALJ did in fact explicitly rely on the opinions of plaintiff's treating physicians, Dr. Zeal and Dr. Mark. The ALJ noted that following plaintiff's first surgery in January 2000, Dr. Zeal released plaintiff to work on April 3, 2000. Similarly, after plaintiff's second surgery (which followed a re-injury of her back), Dr. Mark released plaintiff for work–part time on June 4, 2001, and full time July 9, 2001 with a restriction of lifting no more than 25 pounds. On January 24, 2002, Dr. Mark indicated that plaintiff had a permanent restriction of lifting no more than 50 pounds. These opinions support a finding that plaintiff was able to perform light, or sedentary work. The ALJ also gave considerable weight to the assessments of the state agency physicians who reviewed the evidence, Drs. Willingham and Blumenthal. Both opined that plaintiff was capable of light work.

Plaintiff complains, however, that the ALJ should have relied on Dr. Mark's July 2002 notation of '[n]o work – [patient] is to be scheduled for surgery." Defendant correctly observes that this notation is not time specific, and does not indicate that plaintiff would be incapable of performing any work, for example, sedentary work. This notation is not accompanied by any findings which would support an inability to work. For example, following this notation, examinations noted "normal strength, mass, and tone [and] normal gait." (*See, e.g.,* Tr. 247). Moreover, there is nothing in the medical evidence to indicate that plaintiff would have trouble sitting. (*See, e.g.,* Tr. 439 (November 20, 2003 office note from Dr. Mark noting plaintiff is "experiencing back pain and leg pain with weight-bearing activity."). Additionally, the Court notes that when making this notation, Dr. Mark was surely not aware that it would take until 2005

to receive authorization for the surgery. Moreover, the Court notes that plaintiff was apparently looking for work after this note. Finally, defendant correctly states that responsibility for making the determination that a claimant is disabled rests with the Commissioner, therefore, the doctor's ultimate conclusion of disability is not determinative.

Finally, as defendant observes, despite plaintiff's assertions regarding the alleged inconsistency between the ALJ's finding that plaintiff was not disabled during this time period, and her previous finding that she was disabled as of February 26, 2004, that finding was made in a different decision, based on a separate application, a separate hearing, and evidence that is not before this Court. Morever, as noted above, the February 26, 2004 date was a clerical error made in the November 2008 decision.

Consequently, the Court finds that the ALJ appropriately discussed the weight given to the medical opinions, appropriately weighed the evidence and substantial evidence supports her decision.

### 2. Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record. See 20 C.F.R. § 404.1529; see also *Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5

(N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged. . . ." 20 C.F.R. § 404.1529(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id*. § 404.1529(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. Id. § 404.1529(c)(3). If the ALJ finds that plaintiff's pain contentions are not credible, he must state his reasons "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." *Young v. Astrue*, No. 7:05-CV-1027, 2008 WL 4518992, at *11 (N.D.N.Y. Sept. 30, 2008).

As an initial matter, after thorough review of the ALJ's decision, the Court disagrees with plaintiff's argument that the ALJ simply relied on ALJ Bergstrom's prior credibility determination. Instead, it appears that ALJ Koennecke discussed the factors outlined above, and

concluded that plaintiff was not fully credible. Indeed, the ALJ discussed plaintiff's activities of daily living, observing that she took care of personal needs, prepared her own meals, did laundry, vacuumed, mopped the floors, washed dishes, drove to and from the grocery store and shopped for food, watched television, went for walks, and did stretching exercises, socialized with her daughter and neighbors, and periodically mowed the lawn with a riding lawnmower. Moreover, there were times that plaintiff even returned to work. Notably, the Court observes that the ALJ did give weight to plaintiff's subjective symptoms, finding that after March 1, 2002, plaintiff was limited to sedentary work instead of light work.

The ALJ's conclusion is supported by substantial evidence. Although plaintiff's back impairment undoubtedly causes pain and limitations, it is for the ALJ to assess her credibility. In light of plaintiff's daily activities, her work following her first surgery, and the medical evidence, the ALJ's determination is consistent with the evidence. Having reviewed the entire record, the Court finds that the ALJ applied the correct legal standard in assessing plaintiff's credibility, and, taken as a whole, the record supports the ALJ's determination that plaintiff's claims were not entirely credible and the ALJ adequately specified the reasons for discrediting plaintiff's statements.

### 3. Step 5 Determination

Once the plaintiff shows that she cannot return to her previous work, the Commissioner bears the burden of establishing that she retains the RFC to perform alternative substantial gainful work in the national economy. *Butts v. Barnhart*, 388 F.3d 377, 383) (2d Cir. 2004). In the ordinary case, the ALJ carries out this fifth step of the sequential disability analysis by applying the applicable Medical-Vocational Guidelines ("Grids"). *Id.* The Grids divide work into

sedentary, light, medium, heavy, and very heavy categories, based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. Pt. 404, Subt. P, App. 2. Each category has its own Grid which takes into account the claimant's age, education, and work experience. Based on these factors, the Grids indicate whether the plaintiff can engage in any other substantial gainful work which exists in the national economy.

Generally, the result listed in the Grid is dispositive on the issue of disability. However, an ALJ may not rely solely on the Grids when non-exertional limitations "significantly diminish" plaintiff's ability to work so that the Grids do not fully address plaintiff's limitations. *See, e.g.*, *Vargas v. Astrue*, 10 Civ. 6306, 2011 WL 2946371, at *13 (S.D.N.Y. July 20, 2011). Consequently, where the nonexertional limitations "significantly limit" the range of work permitted by the exertional limitations, or when exertional impairments do not fit squarely within grid categories, the ALJ is required to consult with a vocational expert. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010); *see also Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013) ("We have explained that the ALJ cannot rely on the Grids if a non-exertional impairments has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert."). The ALJ's determination of whether the impact of the nonexertional limitations "significantly limits" the range of work must be supported by substantial evidence. *See Bapp*, 802 F.2d at 605.

Plaintiff's only nonexertional impairment was a restriction to occasional postural activities. This would not impact the occupational base for sedentary or light work. Therefore, there was no need for a vocational expert, and the ALJ appropriately relied on the Guidelines.

## CONCLUSION

For these reasons, it is therefore

ORDERED that the Commissioner's motion for judgment on the pleadings (Dkt. No. 19) is GRANTED; and it is further

ORDERED that plaintiff's motion for judgment on the pleadings (Dkt. No. 15) is DENIED; and it is further

ORDERED that the Clerk of Court is directed to enter judgment for the Commissioner.

IT IS SO ORDERED.

Date: March 15, 2016

Norman A. Mordue
Senior U.S. District Judge